UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| DAVID WOOD<br>1314 Harbor Road<br>Annapolis, MD 21403<br><br>       *Plaintiff*<br><br>     v.<br><br>MARYLAND DEPARTMENT OF<br>TRANSPORTATION<br>Dept. of Transportation Building<br>7201 Corporate Center Drive<br>Hanover, MD 21076<br>Serve on: Pete K. Rahn, Secretary<br><br>MOTOR VEHICLE ADMINISTRATION<br>6601 Ritchie Highway, NE, Room 200<br>Glen Burnie, MD 21062<br>Serve on: Damon L. Bell, Esq., Counsel<br><br>      *Defendants* | Case No. 1:18-cv-3482 |

## COMPLAINT

Plaintiff David Wood, by undersigned counsel, brings this action against the Maryland Department of Transportation ("MDOT") and the Motor Vehicle Administration ("MVA"), and states:

### NATURE OF THE ACTION

1.  This is the second action brought by Mr. Wood against MDOT and MVA for violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") and the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.*, as amended ("Rehabilitation Act").

2.      On May 7, 2018, in an unpublished opinion, the U.S. Court of Appeals for the Fourth Circuit affirmed (the "Affirmance") the dismissal without prejudice of the first such action for failure to state facts sufficient to support a claim.

3.      This Complaint corrects factual misunderstandings in the Affirmance, pleads facts deemed missing from the first complaint, and states a cause of action against MDOT and MVA for violations of federal disability laws upon which relief may be granted.

4.      Mr. Wood alleges herein that he has always been—and will be for the foreseeable future—an excellent driver.  Maryland's one and only reason for denying Mr. Wood access to a driver's license is that he has too narrow a range of peripheral vision.  Mr. Wood alleges herein that he has overcome this disability while driving by compensating; in the ordinary course of driving, he keeps adequate track of objects, signs, and traffic to drive safely.

5.      Because Mr. Wood is demonstrably a safe driver, and because the best available medical science encourages individualized assessment of driving capability for individuals with narrow field of vision, Maryland violated federal disability law when it denied Mr. Wood access to an individualized assessment of his driving ability before denying him access to a driver's license.

6.      Mr. Wood would like to drive to the grocery store or to see his nearby friends.  He would like to go get coffee once in a while or go to his post office.  He would drive mostly, if not exclusively, by day and mostly, if not exclusively, in or around Annapolis.  This case is about letting him earn the opportunity to live an ordinary life and overcome his disability.

**PARTIES**

7.      David Wood is a natural person, of legal age to drive a motor vehicle, and a resident of Anne Arundel County in the State of Maryland.  He suffers from retinitis pigmentosa,

an ocular condition which restricts his peripheral vision.  In November 2015, he was a licensed

driver. From September 2015 to November 2015, he attempted unsuccessfully to renew his

license. This case arises from his unsuccessful attempt to renew his license.

8.     The Maryland Department of Transportation ("MDOT") is a principal unit of the

government of the State of Maryland, with responsibilities for the state's highways, mass transit,

port, air transport, motor vehicles, and driver licensing.

9.     MDOT is—or administers a program and/or activity that is—receiving federal

financial assistance, and is consequently subject in all of its programs and/or activities to the

requirements of the federal Rehabilitation Act of 1973 as amended, codified at 29 U.S.C. §§ 701

*et seq.*, and in particular Section 504, codified at 29 U.S.C. § 794, which guarantees freedom

from discrimination against the disabled "under any program or activity receiving Federal

financial assistance."

10.     MDOT receives federal subsidies under various federal Department of

Transportation programs, including, but not limited to, the Appalachian Highway Development

Program and the High Priority Highway Projects Program.  U.S. Dep't of Transportation,

Federal Highway Administration, Federal-aid Program Administration, *A Guide To Federal-Aid*

*Programs and Projects*, (last visited May 9, 2018).[1]

11.     According to the MDOT, it received approximately $73 billion in federal

highway, mass transit and other multimodal project aid from 2008 to fiscal year 2017.  MDOT,

Maryland's Consolidated Transportation  Program, FY2016 to FY2021 8 (last visited

May 9, 2018).[2]  MDOT projects that it will rely on federal funding for 22% of its total funding

---

[1] *available at* https://www.fhwa.dot.gov/federalaid/projects.cfm .

[2] *available at* http://www.mdot.maryland.gov/Office_of_Planning_and_Capital_Programming/CTP/CTP_16_21_Draft/Draft_CTP_Documents/1_Introduction.pdf .

through FY2023.  MDOT, Maryland's Consolidated Transportation  Program, FY2018 to FY2023 (last visited May 9, 2018).[3]

12.     MDOT and all of its units are subject to the Rehabilitation Act, and their sovereign immunity with respect to federal remedial legislation is waived in exchange for the federal funds MDOT accepts. 42 U.S.C. § 2000d-7(a)(1) (state agency accepting federal funds cannot raise defense of sovereign immunity against § 504 claims).

13.     The Motor Vehicle Administration ("MVA") is a unit of MDOT, responsible for issuing drivers' licenses.  It is named as a Defendant for the same reasons as are recited in paragraphs 9 through 12 above concerning MDOT, its parent agency.  "Program or activity" within the meaning of the Rehabilitation Act extends to the entire state governmental unit which receives any federal financial assistance, including sub-units. Civil Rights Restoration Act of 1987, 42 U.S.C. § 2000d-4a.

14.     MDOT and MVA are also subject to the requirements of Subchapter II of the federal Americans with Disabilities Act of 1990, 42 U.S.C. § 12131 *et seq.*, which prohibits "any State . . . government" from denying a "qualified individual with a disability" from excluding such individual "by reason of such disability" "from participation in or . . . the benefits of the services, programs, or activities" administered by that "public entity." There is no state sovereign immunity under Subchapter II of the ADA, for purposes of the relief sought in this action.

---

[3] *available at* http://www.mdot.maryland.gov/newMDOT/Planning/CTP/CTP_18_23_Final/1%20Summary%20of%20the%20Consolidated%20Transportation%20Program.pdf .

## JURISDICTION AND VENUE

15.     A substantial part of the events or omissions giving rise to the claims described herein occurred in this District and within the Northern Division thereof. Venue is therefore proper in this Court.

16.     This action arises under the federal Rehabilitation Act and under the ADA and under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.  Private civil remedies under the Rehabilitation Act are made available under 29 U.S.C. § 794a, incorporating similar remedies available under Title VI of the 1964 Civil Rights Act.  Private civil remedies under the ADA are made available at 42 U.S.C. § 12188, incorporating the remedies provided under 42 U.S.C. § 2000a-3.  All of these laws are "laws . . . of the United States" within the meaning of 28 U.S.C. § 1331, and this Court has subject matter over these claims.

17.     All parties reside and/or have their principal place of business in this District and are therefore subject to the territorial jurisdiction of this Court.

18.     Defendants are subject to the personal jurisdiction of this Court under the federal laws under which this case arises, for purposes of the sorts of relief which are sought herein, without violating Maryland's sovereign immunity.

## FACTS COMMON TO ALL COUNTS

**A.     Mr. Wood Has Been a Safe Driver Because He Compensates for And Overcomes His Disability.**

19.     Mr. Wood suffers from retinitis pigmentosa.  The National Institutes of Health defines retinitis pigmentosa as "a group of rare, genetic disorders that involve a breakdown and loss of cells in the retina—which is the light sensitive tissue that lines the back of the eye. Common symptoms include difficulty seeing at night and a loss of side (peripheral) vision."

NIH National Eye Institute, *Facts About Retinitis Pigmentosa* (May 2014),

https://nei.nih.gov/health/pigmentosa/pigmentosa_facts .

     20.     Mr. Wood was first diagnosed with retinitis pigmentosa in 1969.

     21.     Mr. Wood has been licensed to drive by Maryland's Motor Vehicle

Administration and had routinely driven on a regular basis for over forty years, up until his

license expired on November 29, 2015.  Mr. Wood's routine driving included driving

approximately 80 miles per day—including a round-trip commute—in all weather, day and

night, and in all traffic volumes.  Mr. Wood had retinitis pigmentosa at all times while he was a

licensed driver in Maryland.

     22.     Mr. Wood has never been held by any court or administrative agency to have

violated the driving laws, or having incurred civil liability to any other driver. There are no

points on his record, under the system of assessing points for criminal violations of the motor

vehicle operations law established by Md. Ann. Code, Transp. §§ 16-401 *et seq*.

     23.     Mr. Wood last had his license renewed in or about September 2009.  Neither

MDOT nor MVA tested Mr. Wood's vision in relation to the renewal of Mr. Wood's license in

2009.  Mr. Wood was not required to submit a form related to his vision to MDOT or MVA to

renew his license in 2009.[4]

     24.     Mr. Wood was not required to report his visual field status to MDOT or MVA in

2009.  The current regulation requiring reporting of "an eye problem which prevents a corrected

minimum visual acuity of 20/70 in at least one eye or binocular field of vision of at least 110

---

[4] The U.S. Court of Appeals for the Fourth Circuit assumed, without any evidentiary record below, that Mr. Wood "must have demonstrated a field of vision of at least 110 degrees as of November 2009."  *Wood v. Md. Dep't of Transp. (Wood I)*, 732 F. App'x 177, 180 n.1 (4th Cir. 2018) (unpublished).

degrees," COMAR 11.17.03.02-1(A)(11), was first enacted on April 22, 2011, and became

effective on May 2, 2011.  2011 Md. Reg. Text 248777 (NS) (West 2017).[5]

25.     Mr. Wood's field of vision from 2009 to 2015 was substantially similar to his

field of vision now.

26.     Mr. Wood's retinitis pigmentosa is routinely evaluated by doctors at Johns

Hopkins University over the last nine (9) months, who followed him as part of a study on

treatments to prevent the proliferation of his retinitis.  Mr. Wood currently sees his personal

ophthalmologist, Dr. Nesti, quarterly.  Mr. Wood has seen an ophthalmologist regularly for more

than forty years.  Mr. Wood's personal ophthalmologist has consistently found Mr. Wood's field

of vision to be stable.

27.     During the period from 2010 to 2015, Mr. Wood maintained a perfect driving

record; was never held to have violated any driving laws or incurred civil liability to any other

driver.

**B.     Mr. Wood Is a Safe Driver Now, and Will Be for the Term of His License
         Because His Visual Field Is Stable.**

28.     Mr. Wood's visual field was assessed along three criteria on September 15, 2017.

In all three criteria, Mr. Wood's ophthalmologist rated his visual field "stable."

29.     Mr. Wood's visual field was assessed along three criteria on August 24, 2016.  In

all three criteria, Mr. Wood's ophthalmologist rated his visual field "stable."

30.     On October 13, 2015, as part of the MVA process that led to this Complaint,

Mr. Wood's ophthalmologist's office filled out a form.  In the visit note regarding the form, the

ophthalmologist identifies his "myopia [narrow field of vision] of both eyes" as "stable."

---

[5] *available at* https://www.westlaw.com/Document/I5BF8F690B7F811E092D9A92117E5ED04/View/FullText.html?transitionType=Default&contextData=(sc.Default)&VR=3.0&RS=cblt1.0 .

31.     Mr. Wood's visual field was assessed along three criteria on May 6, 2015.  In two criteria, Mr. Wood's ophthalmologist rated his visual field "stable."  In the third, the analysis notes "thinning" associated with glaucoma, which has been successfully controlled for years using a treatment called COSOPT.

32.     The last note of "peripheral loss due to RP," or visual field loss, was noted on October 28, 2013.

33.     In addition to the foregoing visual field tests, Mr. Wood's ophthalmologist has described his myopia and/or his retinitis pigmentosa as stable on the following dates: February 15, 2013; March 20, 2013; June 27, 2013; October 28, 2013; November 11, 2013; December 16, 2013; January 15, 2014; February 21, 2014; May 22, 2014; September 18, 2014; October 1, 2014; October 20, 2014; January 29, 2015; February 10, 2015; May 6, 2015; September 9, 2015; October 13, 2015; January 8, 2016; April 21, 2016; August 24, 2016. Mr. Wood's ophthalmologist does not list retinitis pigmentosa or myopia as part of her "impression" after the August 24, 2016 note.

34.     Mr. Wood's recent medical history of field-of-vision stability reasonably suggests that he would have retained his current field of vision from his license renewal in November 2015 until the expiration of that license in 2021.[6]

## C.     Mr. Wood's Ability to Overcome His Disability and Drive Safely Continues to Improve as Driving Technology Improves.

35.     A substantial number of modern automobiles—including Mr. Wood's car—come equipped with features designed to assist a driver in reacting to objects outside their field of vision ("Crash Avoidance Features").

---

[6] The U.S. Court of Appeals for the Fourth Circuit assumed, without any evidentiary record below, that Mr. Wood's retinitis is likely to be degenerative. *Wood I*, slip op. at 10, 2018 WL 2095229, at *4 (suggesting that even if Mr. Wood is not "unsafe," he is still "unfit" to drive).

36.     The Insurance Institute for Highway Safety ("IIHS") maintains an inventory of Crash Avoidance Features on automobiles by make and model.  IIHS, *Crash avoidance features by make and model*, iihs.org (last visited May 18, 2018).[7]  IIHS writes of these features: "Crash avoidance features are rapidly making their way into the vehicle fleet. Six of the most common new technologies are forward collision warning, autobrake, lane departure warning, lane departure prevention, adaptive headlights and blind spot detection."  *Id*.

37.     Crash Avoidance Features aid drivers, regardless of visual field, in identifying objects they are not looking at or responding to, including objects in their "blind spot" or behind their car.

38.     Crash Avoidance Features are rapidly becoming a mandatory component of the U.S. automobile fleet.  In March 2016, the U.S. Department of Transportation and IIHS announced "a[n] historic commitment by 20 automakers representing more than 99 percent of the U.S. auto market to make automatic emergency braking a standard feature on virtually all new cars no later than . . . Sept. 1, 2022."  IIHS, *U.S. DOT and IIHS announce historic commitment of 20 automakers to make automatic emergency braking standard on new vehicles*, iihs.org (Mar. 17, 2016).[8]

39.     The rapid introduction of Crash Avoidance Features substantially improves the ability of individuals with field of vision deficiencies to compensate for such disabilities and drive safely.

40.     There is an available reasonable accommodation for Mr. Wood's peripheral vision loss, namely the use of Crash Avoidance Features to help him identify obstacles at the

---

[7] *available at* http://www.iihs.org/iihs/ratings/crash-avoidance-features .

[8] *available at* http://www.iihs.org/iihs/news/desktopnews/u-s-dot-and-iihs-announce-historic-commitment-of-20-automakers-to-make-automatic-emergency-braking-standard-on-new-vehicles .

periphery of his vision.  Mr. Wood's 2014 Mazda 26 is equipped with several Crash Avoidance

Features, including radar-based side collision detection.

**D.     Mr. Wood Was Improperly Denied a Driver's License Despite His Concerted Effort in Seeking Individualized Assessment.**

41.     In September 2015, Mr. Wood received license renewal papers from the MVA.

Among them was a form requiring a physician's certification of his visual status ("Vision

Screening Form"), attached hereto as <u>Exhibit 1</u>.

42.     Mr. Wood took the form to Dr. Heather Nesti, an ophthalmologist, who

determined that Mr. Wood did not meet MVA standards for peripheral vision. Specifically, she

could not check the "yes" box as to the question "Does this patient meet the continuous field of

vision requirements specified by the MVA?"

43.     The "standards specified by the MVA," as Dr. Nesti was aware, called for "a

continuous field of vision of at least 110 degrees and with at least 35 degrees lateral to the

midline of each side." Md. Ann. Code, Transp. § 16-110.1(c)(2). This Code provision is partially

implemented by a regulation issued by MDOT which requires a license applicant to report to the

MVA any "eye problem which prevents . . . binocular field of vision of at least 110 degrees."

COMAR 11.17.03.02-1. Mr. Wood has a total field of vision of approximately 55 degrees.

44.     Dr. Nesti returned the form to Mr. Wood without checking the box. She

recommended that he contact the MVA Medical Advisory Board (the "Board"). The Board is

statutorily charged with investigating cases in which it appears that the physical condition of a

driver or potential driver may be in issue. Md. Ann. Code, Transp. § 16-118.

45.     Mr. Wood contacted the Board regarding his condition.  The Board then sent

Mr. Wood a survey packet. Mr. Wood filled out the personal portion of the survey, and had his

primary care physician fill out a portion of the form. Then, Mr. Wood revisited Dr. Nesti's clinic,

where another ophthalmologist entered his data and signed that form. The form was then faxed to the MVA at a number provided.

46.    Mr. Wood received a letter from Nurse C. Friedman on MVA letterhead, dated November 30, 2015, advising him that he did not meet the standard, and was rejected for licensure.  She advised him that (a) the MVA had imposed a "J, Must Clear Medical Advisory Board" restriction on him; (b) in order to have the restriction lifted, he would need to be evaluated and cleared by the MVA's Medical Advisory Board; and (c) he would be allowed to reapply "only if" his "medical condition improved."

47.    Nurse Friedman's letter constituted an administratively final action. No appeals rights were recited in the letter, absent some improvement in Mr. Wood's disability.

48.    After receiving Nurse Friedman's letter, on the advice of counsel, Mr. Wood made further efforts to have the matter reconsidered.  He wrote letters and/or emails to public officials, including Pete Rahn, the Secretary of Transportation, and Damon Bell, one of the Assistant Attorneys General representing the MVA.  Mr. Bell wrote back, asking for details, which Mr. Wood provided by email dated January 7, 2016.  Mr. Wood also sought advice, aid, or policy change from Governor Larry Hogan, Attorney General Brian Frost, Delegate Herbert H. McMillan, Speaker Michael E. Busch, and Maryland Senator John Astle.

49.    On February 29, 2016, Neil I. Jacobs, Assistant Attorney General, responded on behalf of Mr. Bell and the MVA via email.  Mr. Jacobs wrote that, based upon his "review" of Mr. Wood's "entire Driver Wellness Safety/MAB file," the MVA "cannot legally issue you a license to continue driving at this time." Mr. Jacobs cited Md. Ann. Code, Transp. § 16-110.3(a)(1)(ii), which requires that the applicant have "a continuous field of vision of at

least 110 degrees and with at least 35 degrees lateral to the midline on each side." Again, no avenue of appeal was suggested.

50.     At every stage of his interaction with MDOT and MVA, Mr. Wood was categorically barred from driving as a result of his disability, namely his visual field impairment. Mr. Wood was given no opportunity to demonstrate *bona fide* ability to drive, or otherwise overcome the categorical denial.

**E.     Maryland's Categorical Bar Is Unreasonable.**

51.     *Wood I* required that Mr. Wood's complaint "proffer[ a] plausible argument for why the requirement is unreasonable." *Wood I*, 732 Fed. App'x at 184.

52.     For more than a decade, the best available ophthalmological research has suggested that visual field impairment should prompt individualized assessment.

53.     In 2002, a report to the Internal Council of Ophthalmology ("ICO") recommended that individuals with field of vision worse than "120° horizontal, 40° vertical" should receive "individual consideration, may include restrictions."  AUGUST COLENBRANDER, MD ET AL., VISUAL STANDARDS: VISION REQUIREMENTS IN DRIVING SAFETY WITH EMPHASIS ON INDIVIDUAL ASSESSMENT 12 (Feb. 2006).[9]

54.     For more than 30 years, statistical research has suggested that, although visual field can be relevant to driving safety, the relationship is extremely weak.  NATIONAL RESEARCH COUNCIL (US) COMMITTEE ON DISABILITY DETERMINATION FOR INDIVIDUALS WITH VISUAL IMPAIRMENTS, VISUAL IMPAIRMENTS: DETERMINING ELIGIBILITY FOR SOCIAL SECURITY BENEFITS, *Test of Visual Functions* (2002) ("although these relationships are statistically significant, the correlations are quite low, and visual field extent typically accounts for only

---

[9] *available at* http://www.icoph.org/downloads/visionfordriving.pdf .

about 5 percent of the variance for accident and conviction records") [hereinafter CDDIVI].[10]

This may account for the enormous variety in national and state visual field requirements. *Id.*

(identifying thresholds "from about 20° to about 140°").

55.     Most of the effects of visual field deficits on driving are noticed for visual fields

of less than 40°.  Joanne M. Wood & Rod Troutbeck, *Effect of restriction of the binocular visual*

*field on driving performance*, 12(3) OPHTHALMIC AND PHYSIOLOGICAL OPTICS 291–298 (1992).

Mr. Wood's visual field exceeds this threshold.

56.     A recent review of literature on vision and driving suggests that the proper

response to visual field impairment is individualized assessment:

> A number of authors have cautioned that large individual differences exist [among
> drivers with visual field impairments] and that some drivers with such impairments
> may pose no more of a safety risk than normally sighted drivers. As a result,
> individualized assessments of driving skill rather than comprehensive prohibitions
> are recommended.

Cynthia Owsley & Gerald McGuin, Jr., *Vision and Driving*, 50(23) VISION RES. 2348–2361

(Nov. 23, 2010) (citations omitted).[11]

57.     Accordingly, Maryland's 110° field-of-vision requirement is not essential for the

safe operation of a motor vehicle, and a 110° continuous field of vision is not "essential to the

licensed activity." *Cf.* U.S. Dep't of Justice, The Americans with Disabilities Act: Title II

Technical Assistance Manual § II-3.7200 (Nov. 1993).

58.     Similarly, Maryland's 110° field-of-vision requirement, absent reasonable

individualized inquiry, is an unreasonable vision standard for driver's licenses.  The standard is

---

[10] *available at* https://www.ncbi.nlm.nih.gov/books/NBK207559/#ddd00064 .

[11] *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2975746/ .

under-inclusive, in that it prohibits safe drivers from driving in Maryland without bearing a reasonable relationship to the current state of medical knowledge.

59.     Mr. Wood has adequately compensated for his visual field while driving, as demonstrated by his spotless driving record. "Although people with visual field loss tended to demonstrate deficits in driving performance, there were large individual differences. Some individuals appeared to be able to compensate for their visual field loss while others did not, even though they may have had equivalent visual field damage." CDDIVI.

60.     Mr. Wood's ability to drive safely makes him "otherwise qualified" to obtain a driver's license.  *See Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264–65 (4th Cir. 1995).  "Ultimately, driving safety does not depend so much on what is seen, but rather on how quickly and how adequately drivers respond to what is seen." COLENBRANDER at 5.

## COUNT I – AMERICANS WITH DISABILITIES ACT

61.     Mr. Wood incorporates by reference all preceding paragraphs as if full set forth in this Count.

62.     Mr. Wood's retinitis pigmentosa and/or his related visual field impairment constitutes a "disability" within the meaning of the Rehabilitation Act.

63.     A "disability" for purposes of the Rehabilitation Act is "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).

64.     "Seeing" is a "major life activit[y]" within the meaning of the Rehabilitation Act. 42 U.S.C. § 12102(2)(A).  Mr. Wood's retinitis pigmentosa substantially limits his seeing.

65.     "Normal cell growth" is a "major life activit[y]" within the meaning of the Rehabilitation Act.  42 U.S.C. § 12102(2)(B).  Mr. Wood's retinitis pigmentosa substantially affects normal retinal cell growth.

66.     Mr. Wood has a disability under 42 U.S.C. § 12102(1)(A), because his retinitis pigmentosa substantially affects his seeing.

67.     Mr. Wood has a disability under 42 U.S.C. § 12102(1)(B), because he has a record of retinitis pigmentosa substantially affecting his seeing.

68.     Mr. Wood has a disability under 42 U.S.C. § 12102(1)(C), because Defendants regard his current visual field as substantially affecting his seeing and his ability to drive.  *See* 42 U.S.C. § 12102(3)(A).

69.     With respect to driving, Mr. Wood is a "qualified individual with a disability:"

> The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2).  Mr. Wood meets the essential eligibility requirements for driving, because he is a demonstrably safe driver who compensates adequately for his disability.

70.     The Rehabilitation Act prohibits exclusion of a qualified individual with a disability: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

71.     MDOT and MVA are "public entit[ies]" within the meaning of 42 U.S.C. § 12132.  *See also* 42 U.S.C. § 12131(1).

72.     Thus, MDOT and MVA violated the Americans With Disabilities Act when they excluded Mr. Wood from access to a driver's license on the basis of his disability.

73.     As a result of MDOT and MVA's exclusion of Mr. Wood on the basis of his disability, Mr. Wood has suffered from the lack of access, mobility, and autonomy that comes with licensure to drive.

WHEREFORE, Mr. Wood requests that this Court enter judgment in his favor, thereby (a) requiring the State of Maryland to issue a driver's license to Mr. Wood and/or administer a reasonable, individualized assessment of his ability to safely operate an automobile, (b) compensating Mr. Wood for the State of Maryland's deprivation of driving rights, and (c) awarding him costs and reasonable attorneys' fees.

## COUNT II – REHABILITATION ACT

74.     Mr. Wood incorporates by reference all preceding paragraphs as if full set forth in this Count.

75.     The operative portion of the Rehabilitation Act provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a).

76.     Mr. Wood is "otherwise qualified" to receive a driver's license under the Rehabilitation Act for the same reason that he is a "qualified individual with a disability" under the ADA.  *See* ¶¶ 19–41 *supra*.  "The ADA and Rehabilitation Act generally are construed to impose the same requirements due to the similarity of the language of the two acts."  *Wood I*, 732 Fed. App'x at 182 (quoting *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468 (4th Cir. 1999)).

77.     MDOT and MVA are programs receiving federal financial assistance within the meaning of the Rehabilitation Act.  *See* ¶¶ 9–14 *supra*.

78.     Thus, MDOT and MVA violated the Americans With Disabilities Act when they excluded Mr. Wood from access to a driver's license on the basis of his disability.

79.     As a result of MDOT and MVA's exclusion of Mr. Wood on the basis of his disability, Mr. Wood has suffered from the lack of access, mobility, and autonomy that comes with licensure to drive.

WHEREFORE, Mr. Wood requests that this Court enter judgment in his favor, thereby (a) requiring the State of Maryland to issue a driver's license to Mr. Wood and/or administer a reasonable, individualized assessment of his ability to safely operate an automobile, (b) compensating Mr. Wood for the State of Maryland's deprivation of driving rights, and (c) awarding him costs and reasonable attorneys' fees.

## COUNT III – DECLARATORY JUDGMENT

80.     Mr. Wood incorporates by reference all preceding paragraphs as if full set forth in this Count.

81.     As has been alleged above, there is a history of a substantial and continuing controversy between Mr. Wood and the Defendants over whether Mr. Wood is entitled to be considered for a driver's license based on his established history of compensating for his disability, notwithstanding state laws that would purport to exclude him from such consideration. Mr. Wood has exhausted administrative remedies and then engaged in substantial efforts beyond established administrative remedies to obtain such consideration. In all instances, his efforts have been categorically rejected simply because he does not conform to statutory criteria for eligibility.

82.     Because there is a substantial and continuing controversy between Mr. Wood and the Defendants over whether Mr. Wood should receive an individualized determination whether he should be issued a driving license without consideration of the state's statutory criteria, and because Mr. Wood has been injured by the denial to him of a renewed driver's s license, and because a declaration of the primacy of federal law mandating such consideration has therefore become both necessary and appropriate, Mr. Wood may properly request that this court decree declaratory relief to resolve the controversy.

83.     Mr. Wood's injury can be redressed by declaratory relief.

WHEREFORE, Mr. Wood respectfully requests the Court enter judgment as follows:

a.   An order declaring that any exclusion of Mr. Wood from consideration for driver's licensure based upon the criteria of Md. Ann. Code, Transp. § 16-110.3(a)(1)(ii) is forbidden and preempted by the Rehabilitation Act and the Americans with Disabilities Act , which require an individualized assessment to determine whether issuance of a license to Mr. Wood poses a "direct threat" within the meaning of 28 CFR § 36.208(c);

b.   An order further declaring that any individualized "direct threat" assessment to determine whether to issue a driver's license to Mr. Wood must be conducted relying on current medical knowledge or on the best available objective evidence to ascertain the nature, duration, and severity of the risk, the probability that a potential injury will actually occur, and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk;

c.  Awarding Mr. Wood his costs, expenses and reasonable attorneys' fees pursuant to 29 U.S.C. § 794a(b), as incorporated under the Americans with Disabilities Act at 42 U.S.C. § 12133; and

d.  Awarding Mr. Wood such other relief that the Court deems just and proper under the circumstances.

## JURY DEMAND

Mr. Wood hereby demands a trial by jury on any issue triable of right by a jury.

Respectfully Submitted,

*/s/ Joseph Dudek*

Jan I. Berlage (23937)
JBerlage@ghsllp.com
Joseph Dudek (20261)
JDudek@ghsllp.com
Gohn Hankey & Berlage LLP
201 N. Charles St., Suite 2101
Baltimore, Maryland 21201
(410) 752-9300
(410) 752-2519 (fax)